In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1700

CHRISTOPHER RICHARDSON,

*Petitioner-Appellant*,

*v.*

KATHY GRIFFIN, Superintendent,
Miami Correctional Facility,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:14-cv-399-JD — **Jon E. DeGuilio**, *Judge*.

ARGUED MAY 30, 2017 — DECIDED AUGUST 8, 2017

Before WOOD, *Chief Judge*, and RIPPLE and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. The Sixth Amendment to the U.S. Constitution gives a criminal defendant the right "to be confronted with the witnesses against him"; that right applies to both federal and state prosecutions. *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965)). In this case, Christopher Richardson contends that

Indiana's courts violated his Confrontation Clause rights when they permitted the use at his trial of testimonial, out-of-court statements of witnesses who fingered him as the shooter. We appreciate how narrow the path to collateral relief is for state prisoners. We nonetheless conclude that Richardson has shown that Indiana's courts unreasonably applied the Supreme Court's Confrontation Clause cases. We therefore reverse the decision of the district court denying relief under 28 U.S.C. § 2254.

**I**

Late in the evening of August 20, 2010, police officers in Gary, Indiana, were summoned to the scene of a shooting near an apartment building in the downtown area. They learned that Simmuel Mobley, a local resident, had been shot in the leg and taken to a nearby hospital; the shooter had fled. Although Detective Art Azcona, the lead officer on the case, looked around the neighborhood for 20 minutes or so, he had trouble finding eyewitnesses. The only physical evidence the police found was one spent shotgun shell. Earlier that day, Richardson had argued with his girlfriend while the two stood in Mobley's front yard. Mobley ordered them to leave, and apparently they did so.

The only person who was willing to give a formal statement to Detective Azcona was Lazarus Holden, who said that someone named "Chris" was the shooter. Azcona also testified that other sources who were present told him that a person named Chris had shot Mobley. He never identified those "sources." Azcona decided to go to the hospital to see if Mobley could help out. Mobley could not, because he was about to go into emergency surgery. About three weeks later, police officer Jeff Hornyak received an anonymous phone call

in which the caller identified Richardson as the shooter. On September 15, the police arrested Richardson.

The day after the arrest, Azcona returned to the hospital and spoke with Mobley for the first time. He brought prepared questions, which contained numerous references to "Chris." For example, before Mobley made any identification Azcona asked the following questions: "Can you describe what Chris looks like"; "Is Chris also known as Jay-Z"; "Did Chris shoot you in your right thigh"; "Did you hear Chris threaten to kill you"; and "How long have you known Chris." Following these questions, Azcona showed Mobley a six-man photo array and asked him not if he could identify the shooter, but instead if he could identify "Chris Richardson." Mobley, who had known Richardson for a year, picked out his picture without any trouble, and then said that Richardson was the shooter. The next day Azcona filed formal charges against Richardson for aggravated battery, battery by means of a dangerous weapon, and battery resulting in serious bodily injury.

The trial took place in July 2011. The state presented five witnesses: Mobley; Azcona; investigator Cheryl Stanley; and two bystanders, Quanilla Strong and Shawnye Miller. Conspicuously absent from the list was Holden, who at no point testified during trial. The state's strongest evidence—indeed, in some ways its only evidence—came from Mobley himself. Mobley admitted that he was drunk at the time he was shot, but he recalled ordering Richardson off of his property earlier that day, and then later running into Richardson by his car. Mobley recounted that Richardson said, "[Y]ou ain't going to talk to me like you talked to other people," whereupon he shot Mobley in the leg.

No other witness was able to say who the shooter was. Strong and Miller, the other two people who were at the scene, had no direct information. They ran to Miller's car when they heard that someone had a gun. Although an argument was supposedly underway, Miller did not hear it, although she did hear a gunshot. Presented with a lineup, Miller could not identify anyone. Strong said that she saw the shooter, and she described his complexion and height. She also heard snatches of conversation, including one man's saying "if you're going to shoot me, go ahead and shoot me," and another replying "I will shoot you, don't test me, I'll do it." She then heard a shot, and a third person said "Chris, you didn't have to shoot him, man, why did you shoot him?" The police never asked Strong to identify the shooter from a lineup, and though she was asked twice in court to point him out, she could not do so.

Stanley, the investigator, was the one who found the spent shotgun shell, but she did not test it for fingerprints. She also described Mobley's bloody clothing, but that was all she could add.

Detective Azcona was left with the task of knitting together the state's case. At this point, what can only be described as a flood of hearsay poured out. On direct examination, Azcona began by telling the jury about Holden's identification of the shooter—an account that was presented for its truth. Richardson's attorney objected. After a sidebar, the trial judge decided to let Azcona describe the course of his investigation and explain how he first obtained the name "Chris." Richardson's lawyer again objected, but the court cut him off. The prosecutor then asked Azcona if he had taken a statement from the absent Holden, and Azcona responded affirmatively.

In response to another question, Azcona confirmed that he already had come across the name Chris Richardson by the time he went to the hospital to talk to Mobley. The state asserted that it was trying only to find out that Azcona obtained a name from Holden, and that it did not "need" him to say the name "Chris." But that did not stop it from repeating the name several times.

On cross-examination, defense counsel asked Azcona whether it would be fair to say that on five separate occasions he mentioned the name "Chris" to Mobley before he heard Mobley's version of the incident. Azcona started to answer by identifying the source of the name (*i.e.* Holden), but defense counsel cut him off before he could complete the thought. The prosecutor objected and argued that the *defense* had opened the door to an exploration of the source of Azcona's information. The court agreed with the prosecutor, and so it allowed Azcona to explain that his use of "Chris" rested on Holden's statement and an anonymous tip. Azcona came back to this point on redirect examination, again confirming that the name "Chris" came up during his initial investigation and when he took Holden's statement. In her closing argument, the prosecutor obliquely referred to this as "corroborating testimony" for Mobley's identification.

The jury convicted Richardson on all counts. After his appeal in the state court, he wound up with a sentence only for aggravated battery, for state double-jeopardy reasons. He argued on appeal that Azcona's testimony violated the Confrontation Clause of the Sixth Amendment. Although the Indiana Court of Appeals expressed some uncertainty over the question whether this issue had been preserved through counsel's objections, it decided to address the argument on

the merits. That was as far as Richardson got, however. The appellate court ruled that, to the extent that there was error in Azcona's statement on cross-examination to the effect that Holden and the anonymous caller had identified him by name, that error was invited. In addition, the court found any error stemming from Azcona's direct testimony was harmless, because it thought that the conviction was supported by substantial independent evidence—namely, Mobley's identification and Strong's testimony that immediately after the shots, an unknown man said "Chris, you didn't have to shoot him." After exhausting his state-court remedies, Mobley turned to the federal court for relief under 28 U.S.C. § 2254. He failed again, but this court granted a certificate of appealability on the Confrontation Clause question, to which we now turn.

## II

If Richardson's Confrontation Clause rights were not violated by what went on at his trial, our task would be simple: no error, no relief. If those rights were violated, on the other hand, then we must tackle the reasons the Indiana Court of Appeals gave for overlooking the error: that it was invited, or that it was harmless. In undertaking these inquiries, we must follow the standard of review established in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), as codified in 28 U.S.C. § 2254(d). That statute forbids the issuance of a writ of habeas corpus for a state prisoner unless the operative state-court decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

## A

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court addressed the reach of the Confrontation Clause. It applies, the Court said, to "'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id.* at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The Court went on to give some examples of testimonial statements. Prominent among those examples were "[s]tatements taken by police officers in the course of interrogations … ." *Id.* at 52. Furthermore, the Court said, "[t]he historical record also supports a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54. Nontestimonial hearsay is another matter, but "[w]here testimonial evidence is at issue, … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68.

Applying *Crawford*'s holding to the present case, we have no doubt that the statements that Holden and the unnamed witness(es) made were testimonial. Holden was responding to Azcona's questioning, and his statements went to the core fact that the state was trying to prove: the identity of the shooter. In other words, the state was using these statements to prove the truth of the central issue, not for any other reason recognized by the hearsay rules or otherwise. The state tried to justify the admission of Azcona's report of what Holden and the unnamed witness said as an account of the course of

Azcona's investigation, but, as we explained in *Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011), this goes well beyond the boundaries the Supreme Court has established. The state had no need to explain why Azcona used the name "Chris" when he was talking to Mobley in the hospital. As we said in *Jones*,

> an unthinking, expansive application of the course of investigation exception would effectively undermine the Confrontation Clause: Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule.

*Id.* at 1046 (quotation marks and citation omitted).

The state's frank statement to the jury that Holden's and the other witness's statements corroborated Mobley's account is further proof that it was using the former two statements for the truth, not simply to fill gaps in the account of what happened. There can be no debate about this when one considers the state's closing rebuttal: "And he's got the name Chris from several other people. Okay. Numerous people come forward and they say it's Chris." The jury's questions reinforce this conclusion. It sent out nine questions, four of which related to Azcona's testimony:

- Did Lazarus Holden witness the shooting and did he identify Chris Richardson as the shooter?

- Did Det. Azcona get a statement from Lazarus?

- If not, why did Lazarus not provide a statement?

> - Does Lazarus Holden live at 501 Madison [the address of the apartment building where the shooting took place]?

Holden's testimony obviously loomed large in the jury's mind, and they were using it to help them resolve the key issue in the case. The state's use of both Holden's testimony and that of the unnamed informants to prove that Chris Richardson was the shooter violated Richardson's Confrontation Clause rights.

### B

The Indiana Court of Appeals did not seriously disagree with the conclusion that a Confrontation Clause violation occurred. It instead immediately embraced the two reasons the state offered for disregarding this violation: invited error and harmless error, dispatching both points in a brief paragraph. If either one of those grounds stands, then Richardson loses. If both embody a decision contrary to, or an unreasonable application of, the law as established by the U.S. Supreme Court, then Richardson is entitled to appropriate relief. We consider first the invited error ground, and then harmless error.

### 1

The Indiana Court of Appeals had little to say about invited error. Here is that discussion in its entirety:

> To the extent Richardson objects to Detective Azcona's statement that Holden and an anonymous caller named him as the shooter, Tr. p. 241, Richardson invited this error on cross-examination.

Adding little to that statement, the state's brief in this court has this to offer:

> The Indiana Court of Appeals held that Richardson
> could not challenge this testimony because he invited
> any error (A22), which is a state-law determination
> that Richardson cannot ask the federal court to second-
> guess. See *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citations
> omitted).

Following the reference to *Cone*, we see that the U.S. Supreme
Court simply reiterated the well-known proposition that
"federal courts will not review questions of federal law pre-
sented in a habeas petition when the state court's decision
rests upon a state-law ground that is independent of the fed-
eral question and adequate to support the judgment" 556 U.S.
at 465 (internal quotation marks and citations omitted). The
Court went on to say, however, that this "does not mean …
that federal habeas review is barred every time a state court
invokes a procedural rule to limit its review of a state pris-
oner's claims." *Id.* On the contrary, whether a state rule is ad-
equate to block access to habeas corpus is up to the federal
courts, for "adequacy is itself a federal question." *Id.* (citation
omitted).

The state is correct, to a limited degree. To the extent that
the state appellate court found invited error during cross-ex-
amination, we accept for present purposes that this was an
adequate and independent ground for rejecting Azcona's re-
sponse when he said that the name "Chris" came up during
his conversation with Holden and the anonymous caller. But
it is important that the invited error occurred only during
Azcona's cross-examination, and this was not the only time
when Richardson's Confrontation Clause rights were vio-
lated. He points to five additional instances, none of which
occurred on cross-examination.

First, when Azcona was testifying on *direct* examination, the following exchange took place:

> Q. [Evelyn Scott, prosecutor]: Where were we? All right. You took a statement from an individual named Lazarus Holden?
>
> A. [Azcona]: Yes, I did.
>
> ***
>
> Q. So, the shooting occurred on the 20th and he was still in the hospital on the 16th of September when you went to see him?
>
> A. Yes.
>
> Q. When you went to the hospital, *had you received at that point, through your investigation, the name Chris Richardson, had it come up?*
>
> A. *Yes, I did.*

Tr. at 195–97 (emphasis added).

Second, on redirect examination, the state brought out the following testimony:

> Q. How soon in the course of your investigation did the name Chris come up?
>
> A. The name Chris came up immediately right after the incident.
>
> Q. You received, in the course of talking to individuals that were present, the name Chris was given to you?
>
> A. That is correct.

Q. And then later you took a statement from Lazarus Holden, as we talked about when Attorney Tavitas was cross examining you, correct?

A. Yes.

Q. And did the name Chris again come up?

A. Yes.

Q. At some point in the course of your investigation prior to talking to Simmuel Mobley did the last name Richardson actually come up?

A. Yes.

Tr. at 256–57.

The prosecutor's next reference to the hearsay identification occurred in her initial closing argument, where she had this to say:

We know that Lazarus Holden spoke to Detective Azcona and gave him the name Chris as well. We know that later on in his investigation he received from another source the full name of Chris Richardson.

Tr. at 345.

Finally, the prosecutor twice used the improper evidence in her rebuttal argument. She began by discussing Azcona's meeting with Mobley in the hospital, but quickly turned to the out-of-court witnesses:

Now, the idea that he [Mobley] came forward and they gave him the name Chris Richardson and he's like, oh, yeah, I think it was Chris, I don't know who shot me but, now I'm going to say it's Chris because it's been suggested to me. Detective Azcona sat down with him

from the beginning, do you know who shot you? Chris.
Before he even gets into those typed written questions
or presents that to him, he has an initial discussion
with him, that was his testimony. Do you know who
shot you? Yeah, it was Chris. *And he's got the name Chris
from several other people. Okay. Numerous people come for-
ward and they say it's Chris. He gets another source, of
course, he doesn't want to be named, I know who did it, it
was Chris Richardson.*

… Now, there's corroborating testimony, he's [*i.e.*
Mobley] not the only one that says Chris did it.

Tr. at 375–76, 378 (emphasis added).

The first of these excerpts shows that before any error
could have been invited, the prosecution had already intro-
duced Richardson's name into the mix, expressly relying on
Holden's out-of-court statement. This left defense counsel
with little choice on cross-examination but to respond, some-
how. That was the point at which the state court thought the
defense had invited the error of relying on Holden (and the
anonymous caller) for the truth of the investigation, but the
transcript shows that the impermissible information had al-
ready come into the record, at the prosecutor's behest. Worse,
the prosecutor returned again and again to the improper tes-
timony, both in redirect and in closing argument. We return
to this in a moment when we discuss harmless error. For now,
it is enough to say that transcript does not support a finding
that it was Richardson who broached the subject of Holden's
identification. It was the state that did so, over Richardson's
objection. Even accepting the state court's ruling that Richard-
son invited error by pursuing this during cross-examination,
the harm was already done.

2

The Indiana Court of Appeals had a bit more to say about harmless error, but there was much that it did not consider. Once again, we reproduce its discussion in full:

> Moreover, we need not determine whether Richardson's right of confrontation was violated when the trial court permitted Detective Azcona to testify that he took a statement from Holden and that Richardson's name came up at some point in the investigation, because even assuming that it was, it was harmless error. *The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt such that there is no substantial likelihood that the questioned evidence contributed to the conviction. Hape v. State*, 903 N.E.2d 977, 991 (Ind. Ct. App. 2009), *trans. denied.* Here, Mobley, who had been friends with Richardson for nearly one year, testified that Richardson was the man who shot him in the leg and that as he shot him, Richardson said, "You ain't going to talk to me like you talked [sic] to other people." Tr. p. 289. A witness, Quanilla Strong, also testified that just after the shooting, she heard a man say, "Chris, you didn't have to shoot him, man, why did you shoot him?" *Id.* at 58. This is sufficient evidence to render the admission of testimony regarding non-testifying witnesses harmless.

(emphasis added).

If the question before the state court had been whether the evidence was sufficient to support Richardson's conviction,

we would have no quarrel with this reasoning. Mobley's testimony, buttressed by Strong's statement, would suffice. But that was not the question. Instead, the state court knew that it was addressing whether Richardson's rights under the Sixth Amendment's Confrontation Clause were violated. To answer that question, a court must look for more than whether there is a "substantial likelihood that the questioned evidence contributed to the conviction"; the court must instead "be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). The case that the Indiana court cited, *Hape v. State*, did present a Confrontation Clause argument, but it was one that the defendant had forfeited, and the primary holding of the case was that no fundamental error had occurred because the challenged messages were not testimonial. 903 N.E.2d at 988–89. It is therefore of no help to the state in the present matter.

Asking whether there is "no substantial likelihood" that a result would be different is a far cry from asking whether an acknowledged constitutional error is "harmless beyond a reasonable doubt." The latter standard, on which the state had the burden of proof, is significantly more favorable to a defendant than the one that the state court used. To the extent that one can infer from the state court's reasoning that it believed that a different standard applied, it issued a decision "contrary to" the law as announced by the Supreme Court of the United States. This was precisely the kind of mistake that the Court discussed in its foundational decision defining the standards in section 2254(d), as amended by AEDPA: *Terry Williams v. Taylor*, 529 U.S. 362 (2000).

In *Terry Williams*, the Virginia Supreme Court had looked to *Lockhart v. Fretwell*, 506 U.S. 364 (1993), instead of to *Strickland v. Washington*, 466 U.S. 668 (1984), to assess whether the petitioner had received ineffective assistance of counsel. As Justice O'Connor's controlling opinion stated, that led to a decision "contrary to" clearly established federal law from the Supreme Court. See *Terry Williams*, 529 U.S. at 414–15. Failing to rely on *Chapman* was the same kind of error. If we look at this record instead as one dealing with an unreasonable application of an established standard, the result is the same. To the extent that the Indiana court in Richardson's case equated its "no substantial likelihood" standard with *Chapman*'s "harmless beyond a reasonable doubt" standard, it unreasonably applied the rule established by the U.S. Supreme Court.

One important question remains: whether the state court's error, under the "contrary to" branch or the "unreasonable application" branch of section 2254(d), prejudiced Richardson—in other words, what would have happened if the state court had properly applied the *Chapman* standard? Since this is a collateral proceeding, Richardson must show the error caused him "actual prejudice" as defined by *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). See *Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (discussing *Brecht*). As *Ayala* clarified, *Brecht*'s actual prejudice rule "'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Id.* at 2198. Hence while satisfying *Chapman* remains a prerequisite for habeas corpus purposes, at that stage federal courts "need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*.'" *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119–120 (2007)) (alteration in original).

Under the actual prejudice standard, Richardson is entitled to relief only if we have "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197–98 (internal quotation marks and citation omitted). This requires "more than a reasonable possibility that the error was harmful." *Id.* at 2198 (internal quotation marks and citation omitted).

Richardson meets that bar. If Mobley's identification of the shooter had been untainted, we might have concluded that any error was indeed harmless. Mobley had known Richardson for a year (though we do not know how well) and Strong said that she heard the name "Chris" uttered immediately after the shooting (though even that was hearsay, as she was repeating what she heard someone else say). All it takes is one person to present evidence that a jury might credit. But there were serious problems with Mobley's identification. First, he admitted that he was drunk at the time of the incident. Second, and more importantly, he was not asked to, and did not simply pick "the shooter" out of the photo array. After posing a number of leading questions, Detective Azcona just showed Mobley six photographs and asked him to pick out "Chris Richardson." It is hard to imagine a worse identification procedure. Strong's testimony was also riddled with problems. Although she initially said that she could pick the perpetrator out of a lineup, Strong twice in court asserted that she did not see the perpetrator in the courtroom. Her physical description of the assailant was somewhat inconsistent with Richardson's appearance, and she claimed that a third man was present— a person no one else mentioned—and that this unknown third person said something about "Chris" being the shooter. Last, if the prosecution had made less out of Holden's out-of-court

identification of Richardson, the level of prejudice might have been low enough to allow the result to stand. But the opposite happened: even on direct examination, the prosecution brought out this impermissible testimony, and it then harped on it from cross-examination, through redirect, and throughout the closing argument.

This leaves us with the "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict" to which *Ayala* referred. Because the Confrontation Clause error affected only the trial, Richardson is not entitled to an unconditional writ of habeas corpus. Instead, we REVERSE the district court's decision and ORDER that unless the state initiates proceedings to retry Richardson within 120 days, he is entitled to issuance of the writ.